United States District Court
Southern District of Texas
**ENTERED**
November 18, 2015
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RONALD D. ELLIOTT,                §
                                  §
            Plaintiff,            §
                                  §
v.                                §    CIVIL ACTION NO. H-14-1743
                                  §
DRIL-QUIP, INC.,                  §
                                  §
            Defendant.            §

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald Elliott ("Elliott" or "Plaintiff") brought this action against Defendant Dril-Quip, Inc. ("Dril-Quip" or "Defendant") asserting claims for violation of the overtime provisions of the Fair Labor Standards Act ("FLSA") and breach of contract.[1]  Pending before the court are Dril-Quip, Inc.'s Motion for Summary Judgment ("Defendant's Motion for Summary Judgment") (Docket Entry No. 12) and Defendant's Motion to Strike Plaintiff's Affidavit and Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Defendant's Motion to Strike") (Docket Entry No. 16).  For the reasons stated below, Defendant's Motion to Strike Plaintiff's Affidavit will be denied, and Defendant's Motion for Summary Judgment will be granted in part and denied in part.

---

[1]Plaintiff's Original Complaint ("Complaint"), Docket Entry No. 1, pp. 3-4.

## I.  <u>Background</u>

### A.  **Factual Background**

Dril-Quip manufactures and then sells equipment to oil and gas companies.[2]  Elliott worked for Dril-Quip as a "Manufacturing Engineer" from 2008 until his retirement in 2014.[3]  Dril-Quip maintains a weekly manufacturing engineering schedule, which prioritizes products according to the due dates on the sales orders.[4]  The schedule is given to the Manufacturing Engineers, whose job is to develop a "cost-efficient process for timely manufacturing" the product.[5]  The process developed by the Manufacturing Engineer is called a "router" or "routing."[6]  Dril-Quip's job description for a Manufacturing Engineer is as follows:

> The Dril-Quip Manufacturing Engineer receives a weekly
> manufacturing engineering schedule that identifies the
> products to be manufactured according to sales order due
> date.  The Engineer is responsible to develop a standard

---

[2]<u>See</u> Affidavit of James Holley ("Holley Affidavit"), Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, p. 2 ¶ 3.

[3]<u>See</u> <u>id.</u> at 3 ¶ 5; Employee Request and Employee Status Change Reports, Exhibit C to Defendant's Motion for Summary Judgment, Docket Entry No. 12-3.

[4]<u>See</u> Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, p. 2 ¶ 4.

[5]<u>See</u> <u>id.</u> at 2-3 ¶ 4.

[6]<u>See</u> Oral and Videotaped Deposition of Ronald D. Elliott ("Elliott Deposition"), Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 5:9-6:8; Standard Routing 2-502765-02, Exhibit E to Defendant's Motion for Summary Judgment, Docket Entry No. 12-5.

routing for the manufacture of the product.  Depending on the complexity of the product the standard routing may take a few minutes or as much as a week to develop particularly if it is a new product with new engineering specifications.  In order to construct the standard routing the engineer must have knowledge of metals, heat treating, rough out, quality systems/inspections, special tooling, complex geometrics, and interpretation of engineering drawings and/or engineering specification sheets.  In addition to the standard product routing the engineer regularly receives a Business Activity Query from a Planner(s) requesting updates and/or corrections to the manufacturing process.  The engineer corrects or updates the standard routing in order for the manufacture of the product to be completed.  The manufacturing engineer also must monitor and respond in a timely manner to the Automated Routing Change Control System that is submitted by shop supervisors.[7]

The "router" developed by the Manufacturing Engineer goes through quality and material handling departments, then the product is manufactured, packaged, and delivered.[8]

Elliott worked in an office within the Dril-Quip machine shop and never performed manual work for Dril-Quip.[9]  He had extensive past experience working in manufacturing shops, however.[10]  Elliott

---

[7]Dril-Quip Manufacturing Engineer Job Description, Exhibit D to Defendant's Motion for Summary Judgment, Docket Entry No. 12-4, p. 2; see also Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 9-12.

[8]See Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, pp. 2-3 ¶ 4; see also Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 5-6.

[9]See Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 7, 55:8-55:16.

[10]See id. at 8; Elliott Resume, Exhibit F to Defendant's Motion for Summary Judgment, Docket Entry No. 12-6, pp. 2-3.

-3-

completed one year of college, but did not have a college degree or formal engineering education.[11]

Mr. James Holley ("Holley") was the Manufacturing Engineer Manager while Elliott worked at Dril-Quip.[12] Holley supervised the eight-to-ten Manufacturing Engineers employed by Dril-Quip at any given time.[13] The Manufacturing Engineers did not have to submit the "routers" they created to Holley or any other supervisor for approval.[14] Each Manufacturing Engineer was generally in charge of the Manufacturing Engineering responsibilities for certain product lines.[15]

As a Manufacturing Engineer, Elliott earned between $72,500 and $88,500 per year.[16] He was generally paid a set amount every two weeks, but the parties dispute whether that amount was agreed to for a 40-hour workweek, or whether that was to be his pay

---

[11]See Elliott Resume, Exhibit F to Defendant's Motion for Summary Judgment, Docket Entry No. 12-6, p. 2.

[12]See Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, p. 2 ¶ 2.

[13]See id.; Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 6:20-7:6.

[14]See Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, pp. 3-4, ¶ 7.

[15]See id.

[16]See Employee Request and Employee Status Change Reports, Exhibit C to Defendant's Motion for Summary Judgment, Docket Entry No. 12-3; Affidavit of Michael Mills ("Mills Affidavit"), Exhibit B to Defendant's Motion to Strike, Docket Entry No. 16-2, p. 5 ¶ 12.

regardless of the number of hours he worked.[17]   Manufacturing Engineers were required to submit time sheets showing the hours worked each day.[18]   They were instructed to report the lesser of actual working hours or eight hours per day, and never more than 40 hours per week.[19]

## B.   Procedural History

Elliott filed his Complaint on June 21, 2014, seeking damages for unpaid overtime wages pursuant to the FLSA and for breach of contract.[20]   Dril-Quip filed its Answer on October 20, 2014.[21]   Dril-Quip asserted several affirmative defenses, including that Elliott was paid on a salary basis and qualified as a professional or administrative employee exempt from the FLSA overtime pay requirements, and that Dril-Quip's classification of Elliott as exempt was made in good faith.[22]   Dril-Quip also asserted a statute

---

[17]See Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, p. 3 ¶ 5; Affidavit of Ronald Elliott in Opposition to Defendants' Motion for Summary Judgment ("Elliott Affidavit"), Exhibit A to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No 15-1, p. 1 ¶ 3.

[18]See Elliott Affidavit, Exhibit A to Plaintiff's Response, Docket Entry No. 15-1, p. 1 ¶ 4.

[19]See id. at 1 ¶ 4; Dril-Quip, Inc.'s Answer to Plaintiff's Original Complaint ("Answer"), Docket Entry No. 4, p. 2 ¶ 7.

[20]Complaint, Docket Entry No. 1, pp. 1, 4-5.

[21]Answer, Docket Entry No. 4.

[22]Id. at 4 ¶¶ 1, 3.

of limitations defense, and argued that Elliott was an at-will employee who "ratified any changes in any agreement" by continuing to work over 40 hours per week while aware he was being paid a salary for all hours worked.[23]

Dril-Quip filed Defendant's Motion for Summary Judgment on June 12, 2015,[24] and Elliott responded on July 20, 2015.[25] Dril-Quip filed a Motion to Strike on July 24, 2015, seeking to strike Elliott's Affidavit attached to Plaintiff's Response.[26]

## II. <u>Motion to Strike Affidavit</u>

Dril-Quip has moved to strike Elliott's Affidavit attached to Plaintiff's Response.[27]   A party may not create a fact issue by submitting an affidavit that contradicts, without explanation, the party's prior deposition testimony.  See <u>S.W.S. Erectors, Inc. v. Infax, Inc.</u>, 72 F.3d 489, 495 (5th Cir. 1996).  However, when an affidavit supplements, clarifies, or amplifies facts disclosed in earlier testimony, a court may properly consider the affidavit when

---

[23]<u>Id.</u> at 4-5 ¶¶ 2, 4.  In the alternative, Dril-Quip pleaded that if Elliott was not exempt, Dril-Quip should only be liable for unpaid overtime under the fluctuating workweek method for calculating overtime.  See <u>id.</u> at 5 ¶ 5 (citing 29 [C.F.R.] § 778.114).

[24]Defendant's Motion for Summary Judgment, Docket Entry No. 12.

[25]Plaintiff's Response, Docket Entry No. 15.

[26]<u>See</u> Defendant's Motion to Strike, Docket Entry No. 16.

[27]<u>See</u> <u>id.</u> at 1 ¶ 2.

evaluating whether there is a genuine issue of fact in ruling on a motion for summary judgment.  Id. at 495-96.

Dril-Quip argues that Elliott's Affidavit contradicts his prior deposition testimony.[28]  Dril-Quip has provided a side-by-side comparison of Elliott's Affidavit testimony and allegedly contradictory statements from Elliott's earlier deposition.[29]  However, Dril-Quip's summary of Elliott's deposition testimony, phrased as it is in the first person, is at best a spin on the evidence.  At worst, it is incorrect.  Although the conclusory statements pulled from Elliott's Affidavit may contradict Dril-Quip's summary reformulation of Elliott's deposition testimony, Elliott's Affidavit does not directly contradict any factual statements he made during his deposition.  The court sees no reason to strike Elliott's Affidavit.[30]

### III. <u>Motion for Summary Judgment</u>

Elliott argues that he was a non-exempt employee under the FLSA and that he contracted with Dril-Quip for a set salary based on a 40-hour workweek.[31]  Elliott claims that Dril-Quip violated the

---

[28]Id. at 2-5.

[29]Id. at 4-5.

[30]Dril-Quip also argues that Elliott's Affidavit contains hearsay and violates the best evidence rule.  Defendant's Motion to Strike, Docket Entry No. 16, pp. 5-6.  To the extent that the Affidavit contains hearsay not within an exception or Elliott's characterizations conflict with certain documents, the court has not relied on this testimony, and Dril-Quip's objections are moot.

[31]See Complaint, Docket Entry No. 1, pp. 3-4 ¶¶ 8-16.

FLSA by failing to pay him overtime and that Dril-Quip breached its
contract with Elliott by requiring him to work more than 40 hours
per week.[32]   Dril-Quip has moved for summary judgment on both
claims.

## A.   Standard of Review

Summary judgment is appropriate if the movant establishes that
there is no genuine dispute about any material fact and the movant
is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).
Disputes about material facts are genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party."   Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510
(1986).   The moving party is entitled to judgment as a matter of
law if "the nonmoving party has failed to make a sufficient showing
on an essential element of her case with respect to which she has
the burden of proof."   Celotex Corp. v. Catrett, 106 S. Ct. 2548,
2552 (1986).

A party moving for summary judgment "must 'demonstrate the
absence of a genuine issue of material fact,' but need not negate
the elements of the nonmovant's case."   Little v. Liquid Air Corp.,
37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting
Celotex, 106 S. Ct. at 2553).   "If the moving party fails to meet
this initial burden, the motion must be denied, regardless of the
nonmovant's response."   Id.   If, however, the moving party meets

---

[32]See id.

this burden, "the nonmovant must go beyond the pleadings" and produce evidence of specific facts demonstrating that there is a genuine issue for trial. Id. (citing Celotex, 106 S. Ct. at 2553-54). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).

"In order to avoid summary judgment, the nonmovant must identify specific facts within the record that demonstrate the existence of a genuine issue of material fact." CQ, Inc. v. TXU Mining Co., L.P., 565 F.3d 268, 273 (5th Cir. 2009). "The party must also articulate the precise manner in which the submitted or identified evidence supports his or her claim. . . . When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." Id. (internal quotation marks and citation omitted). "[P]leadings are not summary judgment evidence." Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996).

In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2110 (2000). The court resolves factual controversies in favor of the nonmovant, "but only when there is an actual controversy, that is, when both

parties have submitted evidence of contradictory facts." <u>Little</u>, 37 F.3d at 1075.  If the movant bears the burden of proof on an issue at trial, "that party must support its motion [for summary judgment] with credible evidence that would entitle it to a directed verdict if not controverted at trial." <u>McKee v. CBF Corp.</u>, 299 F. App'x 426, 428 (5th Cir. 2008) (citing <u>Celotex</u>, 477 U.S. at 331).

**B.   Analysis**

1.   <u>Fair Labor Standards Act Claim</u>

The FLSA establishes a general rule that employers must pay overtime wages to employees who work in excess of 40 hours during a seven-day workweek.  <u>See</u> <u>Vela v. City of Houston</u>, 276 F.3d 659, 666 (5th Cir. 2001) (citing 29 U.S.C. § 207(a)(1)).  An employee is entitled to overtime compensation unless the employer can prove that the employee falls within one of several statutory exemptions. <u>Id.</u>  "[T]he ultimate determination of whether an employe[e] qualifies for an exemption under the FLSA is a question of law." <u>Singer v. City of Waco, Texas</u>, 324 F.3d 813, 818 (5th Cir. 2003) (citing <u>Lott v. Howard Wilson Chrysler-Plymouth, Inc.</u>, 203 F.3d 326, 331 (5th Cir. 2000)).  "That ultimate determination, however, relies on many factual determinations that can be resolved by a jury." <u>Id.</u>  One such exemption, which Dril-Quip argues applies here, is for "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

-10-

The term "employee employed in a bona fide administrative capacity" is further defined in 29 C.F.R. § 541.200 as follows:  any employee who is (1) compensated on a salary basis at a rate of at least $455 per week; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

Exemptions from the FLSA's general rule are narrowly construed against the employer, and the application of an exemption is an affirmative defense on which the employer bears the burden of proof.  See Allen v. Coil Tubing Services, L.L.C., 755 F.3d 279, 283 (5th Cir. 2014) (citing Songer v. Dillon Resources, Inc., 618 F.3d 467, 471 (5th Cir. 2010)).  The inquiry into an employee's exempt status is "intensely factbound and case specific." Dalheim v. KDFW-TV, 918 F.2d 1220, 1226 (5th Cir. 1990).  Dril-Quip argues that Elliott meets all three criteria listed above and was properly classified as an exempt administrative employee.[33]  Elliott argues that he meets none, or that, at a minimum, a fact question exists as to each.[34]

---

[33]See Defendant's Motion for Summary Judgment, Docket Entry No. 12, p. 17 ¶ 29.

[34]See Plaintiff's Response, Docket Entry No. 15, pp. 1-2.

>     (a)  Elliott  was  paid  more  than  $455  per  week  on  a salary basis.

To  qualify  as  an  exempt  administrative  employee  under  29 U.S.C. § 213(a)(1),  an  employee  must  be  compensated  on  a  salary basis  at  a  rate  of  not  less  than  $455  per  week.   <u>See</u>  29  C.F.R. §§ 541.200(a)(1),  541.600,  541.602.   It  is  undisputed  that  Elliott was  paid  more  than  $455  per  week.   From  2008  to  2014  Elliott's annual  compensation  ranged  from  $72,500  to  $88,500.[35]   Elliott  was paid  "a  set  amount  per  year"  in  biweekly  payments  equal  to  1/26th of  his  annual  compensation.[36]   Elliott  argues,  however,  that  there is  a  fact  issue  whether  he  was  compensated  on  a  salary  basis  for purposes  of  the  administrative  employee  exemption.[37]

"An  employee  will  be  considered  to  be  paid  on  a  'salary  basis' within  the  meaning  of  these  regulations  if  the  employee  regularly receives  each  pay  period  on  a  weekly,  or  less  frequent  basis,  a predetermined  amount  constituting  all  or  part  of  the  employee's compensation  .  .  .  ."   29  C.F.R. § 541.602.   That  amount,  however, must  not  be  subject  to  reduction  because  of  variations  in  the "quality  or  quantity  of  the  work  performed."   <u>Id.</u>  Nevertheless,  an employer  can  make  deductions  from  a  salaried  employee's  pay  when

---

[35]<u>See</u>  Employee  Request  and  Employee  Status  Change  Reports, Exhibit  C  to  Defendant's  Motion  for  Summary  Judgment,  Docket  Entry No. 12-3.

[36]Elliott  Deposition,  Exhibit  B  to  Defendant's  Motion  for Summary  Judgment,  Docket  Entry  No. 12-2,  pp. 4-5.

[37]<u>See</u>  Plaintiff's  Response,  Docket  Entry  No. 15,  p. 1 ¶ 1.

the employee is absent from work for one or more full days for personal reasons.  Id. § 541.602(b)(1).  Such deductions must be made in full-day increments for each full day the employee misses.  See id.  If an employee misses less than a full day, the employer may not deduct a partial day's pay on an hourly basis.  See id.

Elliott alleges that when he worked fewer than 40 hours in a week, Dril-Quip deducted from his compensation "an amount based on the number of working hours less than 40."[38]  As evidence, Elliott provides two pay stubs for 80-hour pay periods in which he was paid for 79.50 hours and 78.13 hours, respectively.[39]  However, Elliott's assertion that "[c]learly, both of these instances were absences of less than a day"[40] is directly contradicted by the pay stubs themselves.

The pay stubs break down Elliott's compensation into two types of hours:  "Regular Earnings" and "Hourly PTO."[41]  For each of the

_____

[38]Elliott Affidavit, Exhibit A to Plaintiff's Response, Docket Entry No. 15-1, p. 1 ¶ 6.

[39]See Pay Stubs, Exhibit B to Plaintiff's Response, Docket Entry No. 15-2.  The pay stubs do not specify the length of the pay period, but Elliott claims he was paid every two weeks based on a 40-hour workweek.  See also Elliott Affidavit, Exhibit A to Plaintiff's Response, Docket Entry No. 15-1, p. 1 ¶ 3; Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 4-5.

[40]Plaintiff's Response, Docket Entry No. 15, p. 3 ¶ 6.

[41]See Pay Stubs, Exhibit B to Plaintiff's Response, Docket Entry No. 15-2.

two pay periods, Elliott's hours attributed to Regular Earnings are a multiple of 8 but less than 80 — specifically, 24 hours and 72 hours.[42]   The remainder of Elliott's pay for each period is attributed to Hourly PTO — 55.50 hours and 6.13 hours.[43]   In both instances, Elliott's total hours fall short of 80, and the shortfall is less than 8 hours.   However, there is no indication that Dril-Quip deducted pay for an absence of less than a day.   To the contrary, deductions appear to have been made only in full-day increments — 7 days and 1 day, respectively.   As confirmed by Dril-Quip's human resources director, Elliott was on vacation or otherwise absent for 7 days and 1 day, respectively, during these two pay periods, and Dril-Quip did not pay him any salary for the days that he missed.[44]   Pursuant to Dril-Quip's paid time off ("PTO") policy, Elliott elected to apply some of his accrued PTO time for days he was absent.[45]   However, Elliott either lacked, or chose not to utilize, sufficient PTO Hours to make up the entire difference.[46]   There is no evidence in the summary judgment record that Dril-Quip reduced Elliott's compensation based on variations

---

[42]Id.

[43]Id.

[44]Mills Affidavit, Exhibit B to Defendant's Motion to Strike, Docket Entry No. 16-2, pp. 3-4 ¶¶ 5-9.

[45]Id.

[46]See id.

-14-

in the amount or quality of work performed.[47]   The court therefore concludes that Elliott was paid on a salary basis.

> (b)   There is a fact issue whether Elliott's primary duty was directly related to the management or general business operations of Dril-Quip or it's customers.

The second element of the administrative employee exemption requires that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."   29 C.F.R. §§ 541.200(a)(2), 541.201.   Primary duty means "the principal, main, major, or most important duty that the employee performs."   Id. § 541.700(a).   "Consistent with the regulations, the Fifth Circuit has held that, as a general rule, an employee's 'primary duty' will typically require over fifty percent of his work time."   Cornejo v. Sy Food, Inc., No. H-07-2571, 2009 WL 1617074, at *4 (S.D. Tex. April 22, 2009) (citing Lott, 203 F.3d at 331).   "However, time is not the sole parameter to be considered."   Id. (citing Smith v. City of Jackson, Mississippi, 954 F.2d 296, 299 (5th Cir. 1992)).[48]

---

[47]While Elliott was required to submit time cards, "use of timecards does not affect an employee's status as exempt from the FLSA's overtime compensation requirement."   Doherty v. Ctr. for Assisted Reproduction, P.A., 108 F. Supp. 2d 672, 677 (N.D. Tex. 2000), aff'd sub nom., Doherty v. Ctr. for Assisted, 264 F.3d 1140 (5th Cir. 2001).

[48]"A non-exhaustive list of factors courts consider when determining an employee's primary duty include:   (1) 'the relative importance of the exempt duties as compared with other types of (continued...)

Elliott's primary duty was undisputedly the performance of office or non-manual work.[49]  Thus, the issue before the court is whether Elliott's duties as a Manufacturing Engineer creating "routers" for Dril-Quip were directly related to the management or general business operations of Dril-Quip or it's customers.  While general job descriptions in an employee's resume or prepared by the employer may be considered, it is the actual day-to-day activities of the employees that determine whether the employee is exempt, not the labels the employer or employee place on those duties.  See Kohl v. Woodlands Fire Dept., 440 F. Supp. 2d 626, 634 (S.D. Tex. 2006) (citing Tyler v. Union Oil Co. of California, 304 F.3d 379, 404 (5th Cir. 2002), and Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 400-01 (6th Cir. 2004)); Reyes v. Texas Ezpawn, L.P., 459 F. Supp. 2d 546, 553-54 (S.D. Tex. 2006).

Dril-Quip argues that Elliott's primary duty was directly related to its management and general business operations.[50] Elliott was required to interact with various other employees and

---

[48](...continued) duties,' (2) 'the amount of time spent performing exempt work,' (3) 'the employee's relative freedom from direct supervision,' and (4) 'the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.'"  Zannikos v. Oil Inspections (U.S.A.), Inc., 605 F. App'x 349, 352 n.1 (5th Cir. 2015) (citing 29 C.F.R. § 541.700(a)).

[49]See Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 5, 7, 55.

[50]See Defendant's Motion for Summary Judgment, Docket Entry No. 12, pp. 18-21.

departments, to work with programmers on complicated parts, to coordinate design changes (which Elliott would sometimes suggest) with the mechanical engineering department, and to point out mistakes in product design.[51] Dril-Quip also argues that Elliott's work was directly related to Dril-Quip's quality control, as he had to identify what quality system steps were needed for each product in the "router."[52] However, Dril-Quip's Motion for Summary Judgment takes liberties with Elliott's deposition testimony. For example, the Motion for Summary Judgment states: "The parts are inspected by Dril-Quip and the customers, and Elliott often participated in Dril-Quip's quality inspections that included customer representatives at which the customer representative would consult with Elliott, and Elliott would offer his advice to the customer representative and Dril-Quip's quality control team."[53] In support, Dril-Quip cites the following exchange from Elliott's deposition:

> Q.   The next reference here is to quality systems/inspections.  First of all, I mean, what is -- I think I know what an inspection is, but what's a quality system?

---

[51]<u>See</u> Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, pp. 6–7 ¶¶ 12, 15; Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 37–40; E-mail from Ronald D. Elliott to Joe Tracey, Exhibit G to Defendant's Motion for Summary Judgment, Docket Entry No. 12-7, p. 2.

[52]<u>See</u> Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, p. 6 ¶ 13.

[53]Defendant's Motion for Summary Judgment, Docket Entry No. 12, p. 13 ¶ 18.

A.   Well, the quality of the plans or the quality of the steps that the inspectors need to take to ensure that the part is right. Like after a rough-out, you go to an inspector.  They inspect the part, make sure it matches the drawing.  After heat treat, they Rockwell test the part to make sure it matches the hardness requirements.

In the finish machine shop, you'll have inspectors on the lathe side that would inspect it before it went further into the process to the mill side. There was several steps to the inspection --

Q.   I see.

A.   -- and these people on the floor, the inspectors -- you know, you just tell them, you know, QA the part.

Q.   Are the inspectors, are those Dril-Quip employees or are those customer representatives?

A.   The inspectors are Dril-Quip employees, but you would have steps in there periodically -- depending if it had a quality plan that asked for a third-party witness or a third-party monitor.  So then there would be third-party inspectors there to watch the process.

Q.   And are the third-party monitors, are those customer representatives or just like third parties from some vendor that --

A.   They are customer representatives.

Q.   Okay.  And so you -- but your -- so then your router would sort of identify at what steps different types of inspections would have to take place?

A.   Right.

Q.   Is that fair?

A.   Yeah.

Q.   Okay.  And are some of those -- some of those steps are, I take it, driven by what the customer wants done, correct?

-18-

A.   Well, the third party would be -- or the third-
party witness or third-party monitor.

Q.   Right.

A.   The -- you would always put in inspection steps
between -- after it was processed through the lathe
department, you would always put in an inspection
process before it moved to the next department.
You would always put in inspection processes
between every department.

Q.   But there might be additional procedures as part of
those based upon what the customer wants or doesn't
want?

A.   If the customer had a quality plan and it said that
these need to be third-party witnessed or third-
party monitored, then we would put that in.[54]

Elliott testified that he would routinely include quality checks
periodically in the router, and that customers would sometimes make
specific requests that he would incorporate.[55]  He did not testify
that he "often participated in Dril-Quip's quality inspections that
included   customer   representatives   at   which   the   customer
representative would consult with [him], and [he] would offer his
advice   to   the   customer   representative   and   Dril-Quip's   quality
control team."

    In sum, Dril-Quip argues that "Elliott did not work on a
manufacturing production line or sell any products—instead, he
provided work related to Dril-Quip's functional areas such as:

---

    [54]Elliott Deposition, Exhibit B to Defendant's Motion for
Summary Judgment, Docket Entry No. 12-2, pp. 30:22-32:25.

    [55]See id.  See also id. at 21-22.

• Personnel Management – Elliott's work determined what labor would be allocated to manufacture Dril-Quip's products.

• Design – Product design changes were made based on Elliott's recommendations.

• Budgeting – Elliott's routers determined labor and material budgets for Dril-Quip's product lines. Also, every router is "owned" by an ME, and if Elliott made a mistake that caused scrap or rework, those losses were charged to the budget of Elliott's department.

• Quality Control – Elliott's routers are developed to meet product quality specifications, Elliott would create alternate routers based on customers' quality demands, and Elliott would advise customers with respect to quality.

• Manufacturing – Elliott's work determined how Dril-Quip manufactured products.

• Purchasing – Elliott's routers determined how much raw material Dril-Quip would need to purchase to manufacture parts ordered by customers.

• Planning – Elliott's routers helped to determined what materials the Planners would package for manufacturing.

Elliott responds that his duties were routine parts of production and not directly related to management or general business operations.[56]  For example, Elliott testified that he did not design anything for Dril-Quip.[57]  He did not assign particular workers to specific parts or tasks,[58] and did not supervise anyone's

---

[56]See Plaintiff's Response, Docket Entry No. 15, pp. 3-4.

[57]See Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, p. 22.

[58]See Elliott Affidavit, Exhibit A to Plaintiff's Response, Docket Entry No. 15-1, p. 3 ¶ 10.

work.[59]   He relied on an internal resource from the accounting department to get a sense of the cost versus the hours run per product.[60]   Elliott's Affidavit states that "[m]y job was not to determine the order of operations or the most economical method of manufacturing.   A natural sequence was generally required to have the part ready for the next step in the process.   The materials used on a part were specified by Mechanical Engineering (not Manufacturing Engineering).   I had to get approval for special tools that might be required for a part routing."[61]

"To meet [the "directly related to the management or general business operations"] requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line. . . ." 29 C.F.R. § 541.201(b).  The distinction between production and administrative tasks is not dispositive, but is still part of the administrative exemption analysis.  See Villegas v. Dependable Construction Services, Inc., No. 4:07-CV-2165, 2008 WL 5137321, at *7 (S.D. Tex. Dec. 8, 2008) (citing Department of Labor, Defining and Delimiting the Exemptions

---

[59]See Elliott Deposition ("Elliott Deposition Part 2"), Exhibit C to Defendant's Motion to Strike, Docket Entry No. 16-3, p. 2.

[60]See Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 52-53.

[61]See Elliott Affidavit, Exhibit A to Plaintiff's Response, Docket Entry No. 15-1, p. 2 ¶ 11.

for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22,121, 22,141 (April 23, 2004)); Owens v. CEVA Logistics/TNT, No. H-11-2237, 2012 WL 6691115, at *8 (S.D. Tex. Dec. 21, 2012); Kohl, 440 F. Supp. 2d at 634-36. "While perhaps a bit archaic, this dichotomy attempts to distinguish 'between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." Clark v. Centene Co. of Texas, L.P., 44 F. Supp. 3d 674, 682 (W.D. Tex. 2014) (citing Dalheim, 918 F.2d at 1230); Miller v. Team Go Figure, L.L.P., No. 3:13-cv-1509-O, 2014 WL 1909354, at *11 (N.D. Tex. May 13, 2014).

The regulations further explain that "[w]ork directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b). Elliott's primary duty does not fall neatly into any of these categories. And, even as Dril-Quip describes them, most of Elliott's duties were related to producing Dril-Quip's products, not management or general business operations. For example, Elliott has

testified that, although he put quality checks into his "routers," doing so between each step or department was a routine requirement for each "router," rather than a quality control decision by the Manufacturing Engineer.[62] And although the time required to manufacture each product impacted Dril-Quip's costs, Elliott was not involved in budgeting; he relied on internal resources and past production runs to estimate the required time for each product.[63]

Relying on cases from the 1940s and 1950s, Dril-Quip argues that "duties similar to Elliott's have been held to satisfy the administrative exemption."[64] Dril-Quip analogizes Elliott's position to that of "process engineers," "factory engineers," and "time study engineers" in Wells v. Radio Corp. of America, 77 F. Supp. 964 (S.D.N.Y. 1948).[65] The described jobs in Wells are similar to the duties of a modern Mechanical Engineer at Dril-Quip.[66] For example, the "process engineers" examined blueprints and

_____

[62]See Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 21-22, 30:22-32:25. See also discussion of this portion of Elliott's deposition at pp. 18-20, supra.

[63]See Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 12, 52-53.

[64]See Defendant's Motion for Summary Judgment, Docket Entry No. 12, p. 23.

[65]Dril-Quip also discusses Hopkins v. General Electric Co., 89 F. Supp. 997, 1000-01 (D. Mass. 1950), and Evans v. Continental Motors Corp., 105 F. Supp. 784, 787-89 (E.D. Mich. 1952).

[66]See Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 18-19; Elliott Deposition Part 2, Exhibit C to Defendant's Motion to Strike, Docket Entry No. 16-3, p. 8; Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, p. 5.

"determin[ed] the most economical method of manufacture consistent with the quantity and quality required and [] specif[ied] in order the exact sequence of the operations to be performed, with a designation of the tools, machine equipment and labor classification to be used in each operation." Id. at 968.

"The inquiry into exempt status is intensively fact-bound and case specific." Roberts v. Nat'l Autotech, Inc., 192 F. Supp. 2d 672, 676 (N.D. Tex. 2002) (citing Dalheim, 918 F.2d at 1225); see also Defining and Delimiting, supra, 69 Fed. Reg. at 22,143. For example, in Kelley v. SBC, Inc., No. 97-CV-2729 CW, 1998 WL 1794379, at *9 (N.D. Cal. Nov. 18, 1998), the defendants cited Wells in support of their motion for summary judgment on the administrative exemption. Recognizing that "[i]n a motion for summary judgment, the Court is required to take the non-movant's evidence as true," the court held: "Given the discrepancies between Plaintiffs' and Defendants' interpretation of the scope and importance of [Plaintiff]'s job duties, the Court finds that issues of disputed material fact remain. These issues include the scope of [Plaintiff]'s job duties, the extent to which Defendants' guidelines (such as the Engineering Manual) prescribed the duties of a Facilities Engineer, the extent to which [Plaintiff] was required to conduct any but the most superficial negotiation as a BIC, and the extent to which the Facilities Engineer and BIC positions required [Plaintiff] to exercise discretion and independent judgment." Id.

-24-

Similarly, in this case there are significant discrepancies between Dril-Quip's and Elliott's interpretations of the scope and importance of Elliott's duties.  <u>See also</u> <u>Villegas</u>, 2008 WL 5137321, at *12 ("While these activities suggest that Dependable may have properly classified Villegas as an administratively exempt employee, without more facts, . . . the Court has insufficient evidence to conclude as a matter of law that Villegas was an administrative employee . . . ."); <u>Owens</u>, 2012 WL 6691115, at *7-*10 (denying summary judgment on "operation supervisor's" FLSA claim because "[the employer's] summary-judgment evidence does not establish as a matter of law how to distinguish Owens's primary duties from work necessary to produce CEVA's products and services."); <u>Team Go Figure</u>, 2014 WL 1909354, at *12 (finding summary judgment inappropriate as the record did not eliminate fact disputes over the plaintiff's primary duties and whether they were related to management or general business operations as opposed to production).  The court therefore concludes that a fact question remains as to whether Elliott's primary duty was directly related to the management or general business operations of Dril-Quip or its customers.

> (c) There is a fact issue as to whether Elliott's primary duty included the exercise of discretion and independent judgment with respect to matters of significance.

The final requirement for an employer to properly classify an employee as an exempt administrative employee is that the

employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §§ 541.200(a)(3), 541.202. Dril-Quip argues that Elliott exercised discretion and independent judgment in order to determine "what Dril-Quip resources should be used to manufacture Dril-Quip parts."[67] Developing routers required Manufacturing Engineers to use "complex geometrics, including trigonometry" to interpret what was required on the schematic drawings and spec sheets and to translate it into the "router."[68] Therefore, Elliott had to have specialized knowledge of "Dril-Quip's manufacturing machinery, labor, time, costs, different types of metals, heat treating, rough-outs, quality system/inspections and special tooling."[69]

Dril-Quip further argues that developing "routers" was a matter of significance[70] and that "Elliott was responsible for investigating and resolving matters of significance on behalf of management, and his conclusions and recommendations played an

---

[67]See Defendant's Motion for Summary Judgment, Docket Entry No. 12, p. 13 ¶ 20 (citing Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, p. 8 ¶ 19).

[68]See Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, p. 8 ¶ 19; Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, p. 23.

[69]See Holley Affidavit, Exhibit A to Defendant's Motion for Summary Judgment, Docket Entry No. 12-1, pp. 8-9 ¶ 19; Defendant's Motion for Summary Judgment, Docket Entry No. 12, pp. 13-14 ¶ 20.

[70]See Defendant's Motion for Summary Judgment, Docket Entry No. 12, p. 22.

important role in the development of Dril-Quip's products and manufacturing methods."[71]   29 C.F.R. § 541.202(b) lists factors the court may consider in determining whether an employee exercised independent discretion and judgment with respect to matters of significance.   Dril-Quip argues that three apply to Elliott: (1) whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; (2) whether the employee has authority to commit the employer in matters that have significant financial impact; and (3) whether the employee provides consultation or expert advice to management.[72]   Elliott argues that Dril-Quip mischaracterizes his responsibilities, which required little judgment and discretion.[73]

29 C.F.R. § 541.202(e) states that "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or

---

[71]Id. at 22 ¶ 43.

[72]The other factors a court may consider are:  "[W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; . . . whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." 29 C.F.R. 541.202(b).

[73]See Plaintiff's Response, Docket Entry No. 15, pp. 5-6.

specific standards described in manuals or other sources." Elliott used his experience and knowledge, but he also relied heavily on old "routers" and other company resources, such that much of his job was routine or "copy and paste."[74] See Chicca v. St. Luke's Episcopal Health Sys., 858 F. Supp. 2d 777, 790 ("Morton's statement that Chicca identified and reduced risks and deficiencies is broad and vague; it certainly indicates that Chicca exercised some amount of discretion and judgment, but it does not specify how he did so, or that the projects on which he exercised such discretion and judgment were related to matters of significance.").

The regulations also state that "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly. For example, . . . an employee who operates very expensive equipment does not exercise discretion and independent judgment with respect to matters of significance merely because improper performance of the employee's duties may cause serious financial loss to the employer." 29 C.F.R. § 541.202(f). Elliott's experience helped him perform his job, but Dril-Quip's arguments regarding his impact on company costs are unpersuasive. See Chicca, 858 F. Supp. 2d at 789 ("The Fifth Circuit has confirmed that 'employees who merely follow prescribed procedures or who

---

[74]See, e.g., Elliott Deposition, Exhibit B to Defendant's Motion for Summary Judgment, Docket Entry No. 12-2, pp. 10–13, 45.

determine whether specified standards are met, such as inspectors or graders,' are not exempted.") (citing <u>Bondy v. City of Dallas</u>, 77 F. App'x 731, 733 (5th Cir. 2003)).

Elliott's Affidavit states that his work was largely "repetitive and clerical in nature."[75]  More specifically, Elliott stated he had no input on part designs or meaningful interaction with the "true design engineers, the Mechanical Engineering department."[76]  The "routers" were put together from those of similar parts manufactured in the past, and labor estimates were taken from historical production runs.[77]  The machine run times were calculated by the machines and compared to similar production runs.[78]  Elliott was part of a team of eight to ten Manufacturing Engineers who were supervised by Holley; Elliott never supervised anyone.[79]  <u>See</u> <u>Lott</u>, 203 F.3d at 330–32 ("Ms. Lott . . . exercised discretion as supervisor of four other employees who worked with her.").  Dril-Quip has not established that Elliott exercised "discretion and independent judgment [beyond] the use of skill in applying well-established techniques, procedures or specific

---

[75]Elliott Affidavit, Exhibit A to Plaintiff's Response, Docket Entry No. 15-1, p. 2 ¶ 7.

[76]<u>See</u> <u>id.</u> at 2 ¶ 8.

[77]<u>See</u> <u>id.</u> ¶ 7.

[78]<u>See</u> <u>id.</u>

[79]<u>See</u> Elliott Deposition Part 2, Exhibit C to Defendant's Motion to Strike, Docket Entry No. 16-3.

standards described in manuals or other sources." 29 C.F.R. § 541.202(e).

The summary judgment record is not sufficient to allow the court to determine other aspects of Elliott's primary job function as a matter of law, let alone whether his primary duties involved the exercise of discretion and independent judgment.

At the summary judgment stage the court cannot make credibility determinations or weigh any evidence. See Chaney v. Dreyfus Service Corp., 595 F.3d 219, 229 (5th Cir. 2010). Although Dril-Quip has established that Elliott was a salaried employee, genuine issues of material fact remain as to the other two elements of the administrative employee exemption. See Songer, 618 F.3d at 471 ("Exemptions under the FLSA are construed narrowly against the employer, and the employer bears the burden to establish a claimed exemption."). See also Dalheim, 918 F.2d at 1226-27 ("[T]he inquiry into exempt status under § 13(a)(1) remains intensely factbound and case specific. . . . Each case must be judged by its own particular facts."); Martinez v. Global Financial Services, L.L.C., No. H-07-0591, 2008 WL 65169, at *2 (S.D. Tex. Jan. 4, 2008) ("The parties describe Plaintiff's job responsibilities differently, and the conflicting evidence creates a fact dispute . . . ."). Considering the evidence in the light most favorable to Elliott, Dril-Quip has not established that "[Elliott] falls 'plainly and unmistakably within [the] terms and spirit' of the exemption." Owens, 2012 WL 6691115, at *5 (quoting A.H. Phillips,

Inc. v. Walling, 65 S. Ct. 807, 808 (1945)).  Because fact issues
remain, summary judgment is not appropriate as to Elliott's FLSA
claim.

   2.   Breach of Contract Claim

      Elliott alleges that Dril-Quip hired him to work for a certain
wage based on a 40-hour workweek, and that "contrary to the offer
of employment," Dril-Quip required Elliott to work more than 40
hours per week.[80]  Elliott alleges that Dril-Quip therefore breached
this "employment agreement" by failing to pay him for "off the
clock" hours worked.[81]

      To prevail on a breach of contract claim under Texas law a
plaintiff must prove:   (1) the existence of a valid contract;
(2) performance or tendered performance by the plaintiff;
(3) breach of the contract by the defendant; and (4) damages to the
plaintiff resulting from the breach.  Lewis v. Bank of America NA,
343 F.3d 540, 544-45 (5th Cir. 2003) (citing Palmer v. Espey
Huston & Assocs., Inc., 84 S.W.3d 345, 353 (Tex. App.—
Corpus Christi 2002, pet. denied)).

      Elliott states in his affidavit, "I was hired by Dril-Quip on
a stated salary pay rate for a 40-hour work week."[82]  Dril-Quip
admits that Elliott routinely worked more than 40 hours per week

---

[80]Complaint, Docket Entry No. 1, p. 4 ¶ 14.

[81]See id. ¶ 16.

[82]Elliott Affidavit, Exhibit A to Plaintiff's Response, Docket
Entry No. 15-1, p. 1 ¶ 3.

and that "for payroll purposes, Plaintiff was instructed to submit timesheets that reflected no more than forty (40) hours because he was paid on a salary basis."[83]  Elliott points to no other evidence of a contract for a 40-hour week.[84]  See Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.").

Dril-Quip argues that Elliott never had an employment agreement, oral or written, that specified a 40-hour workweek.[85] Elliott's employment application listed a salary requirement.[86] Dril-Quip's human resources manager testified that from the time of Elliott's application "Dril-Quip communicated to Elliott, and Elliott indicated to Dril-Quip that he understood, that he would be compensated for all hours worked on a salary basis."[87]  Elliott's

---

[83]Answer, Docket Entry No. 4, p. 2 ¶ 7.

[84]See Plaintiff's Response, Docket Entry No. 15, p. 2 ¶¶ 4-5. Plaintiff's Response only briefly addresses the alleged agreement for a 40-hour workweek, once in the Summary of the Argument, and once in the Statement of Facts.  Docket Entry No. 15, p. 1 ¶ 2; p. 2 ¶ 5.  Elliott does not address the breach of contract claim in the Argument section, except to state "For the reasons outlined above, Defendant's motion for summary judgment should be denied, as the evidence does not support Defendant's challenge to the statutory or contract claims asserted by Plaintiff."  Id. at 7 ¶ 19.

[85]See Mills Affidavit, Exhibit B to Defendant's Motion to Strike, Docket Entry No. 16-2, p. 4 ¶ 10.

[86]See Application for Employment, Exhibit A to Defendant's Motion to Strike, Docket Entry No. 16-1, p. 2.

[87]Mills Affidavit, Exhibit B to Defendant's Motion to Strike, Docket Entry No. 16-2, p. 4 ¶ 11.

reference in his affidavit to "a stated salary pay rate for a 40-hour work week,"[88] without more, is not sufficient to raise a genuine issue of material fact.  See Travelers Ins. Co. v. Liljeberg Enterprises, Inc., 7 F.3d 1203, 1206-07 (5th Cir. 1993) ("'[C]onclusory allegations supported by a conclusory affidavit will not suffice to require a trial.'") (citing Shaffer v. Williams, 794 F.2d 1030, 1033 (5th Cir. 1986)).[89]  Elliott provides neither a written communication from Dril-Quip nor any details of an alleged oral agreement.  His Dril-Quip employment application states:  "In the event of employment, I understand that:  . . . (c) my employment is at will and is for no definite period of time, and as such, either the Company or I may terminate the employment relationship with or without cause at any time."[90]  Elliott has failed to raise a fact issue on whether he had a valid contract limiting the hours he was required to work weekly.  Accordingly,

_____

[88]Elliott Affidavit, Exhibit A to Plaintiff's Response, Docket Entry No. 15-1, p. 1 ¶ 3.

[89]See Mills Affidavit, Exhibit B to Defendant's Motion to Strike, Docket Entry No. 16-2, pp. 4-5 ¶¶ 11-12 ("For instance, on his Dril-Quip application, Elliott expressed his 'Salary Requirements' of $75,000.  Further, when Elliott was hired in 2008, his starting "Salary Offer" was $72,500 per year; in 2009 he received a raise in salary to $75,000 annually; in 2010 he received a raise in salary to $78,000 annually; in 2011 he received a raise in salary to $81,000 annually; in 2012 he received a raise in salary to $84,240 annually; and in 2013 he received a raise in salary to $88,500 annually.").

[90]Application for Employment, Exhibit A to Defendant's Motion to Strike, Docket Entry No. 16-1, p. 3.

Dril-Quip's Motion for Summary Judgment will be granted as to the breach of contract claim.

### IV. Conclusions and Order

For the reasons stated in Section II above, Defendant's Motion to Strike Plaintiff's Affidavit (Docket Entry No. 16) is **DENIED**.

For the reasons stated in Section III above, Dril-Quip, Inc.'s Motion for Summary Judgment (Docket Entry No. 12) is **GRANTED IN PART** and **DENIED IN PART**.

**SIGNED** at Houston, Texas, this 18th day of November, 2015.


_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-34-